UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
In re:

                    Case No. 12-75455-dte

  Sheba Realty Corp.,

                          Chapter 11

    Debtor.
---------------------------------------------------------X

## MEMORANDUM OF DECISION

*Appearances:*

Goldberg Weprin Finkel Goldstein LLP,
*Attorneys for debtor Sheba Realty Corp.*,
1501 Broadway, 22nd Floor
New York, NY 10036
By: J. Ted Donovan, Esq.; Kevin J Nash, Esq.

Berliner & Pilson,
*Attorneys for creditor ADHY Advisors, LLC*
80 Cuttermill Road, Suite 411
Great Neck, NY 11021
By: Richard J. Pilson, Esq.

Hon. Dorothy T. Eisenberg, U.S. Bankruptcy Judge

**Introduction**

Secured creditor ADHY Advisor, LLC ("ADHY"), holds a first mortgage on certain real property of the above-captioned Debtor, located in Manhattan. After the Debtor filed for bankruptcy, ADHY filed Claim #3, a secured claim, in the amount of $3,167,017.81, which includes accumulated interest at the rate of 20% running from approximately April, 2010 through the date that Claim #3 was filed. This rate represents the default interest rate under ADHY's mortgage with the Debtor. Nevertheless, the Debtor proposes a plan of reorganization that aims to leave ADHY unimpaired under 11 U.S.C. § 1124 (and thus ineligible to vote against the plan under 11 U.S.C. § 1126(f)) by paying ADHY in full, on the effective date of the plan, the total sum of $2.39 million, consisting of: (1) $2,045,039.15 in principal and (2) $344,960.85 in interest at the non-default contract rate of 5.625%. This matter arises in connection with a consolidated hearing on final approval of the disclosure statement and confirmation of the plan.

ADHY filed an objection to the Debtor's plan and disclosure statement, stating that the Debtor cannot confirm a plan that pays ADHY anything less than the default interest rate of 20%. The Debtor filed a partial objection to Claim #3, which objected to the claim to the extent that it claims interest at 20%, rather than the pre-default rate of 5.625%. Debtor also objects to certain late fees and other related charges.

For the reasons discussed below, the Debtor's objection to ADHY's claim will be sustained as provided herein. The final hearing on confirmation of the Debtor's plan and approval of the disclosure statement will be adjourned to a future date.

**Background**

The Debtor is the owner of four adjacent pieces of real estate in Manhattan, located at 79 West 124th St., and at 280, 282, and 284 Lenox Avenue (collectively the "Properties"). The

Debtor leases space in the Properties to various tenants. On or around June 7, 2005, the Debtor borrowed the principal amount of $2.25 million from Astoria Federal Savings Bank ("Astoria"), in return for which Astoria received a first mortgage on the Properties. The purpose of the loan was to permit the Debtor to renovate the Properties.[1]

The note has a 10-year term, with an interest rate of 5.625%. Payments under the note and mortgage were to commence on August 1, 2005 and would come due on the first day of each month thereafter. A late fee is automatically imposed, without notice, for any payment received after the 15th of a given month. Other pertinent provisions of the note and mortgage will be addressed in the Discussion section, *infra*.

When the Debtor first executed the note and mortgage, its offices were located at 507 West 186th Street, New York, NY. In 2008, the Debtor relocated to 20 W. 38th St., New York, NY. By letter dated May 6, 2008, the Debtor notified Astoria of the change in its address. Since the notification, Astoria, for the most part, has communicated with the Debtor at the new address, with the exception of two crucial pieces of correspondence, discussed further *infra*.

At first, the required monthly payments were more than $19,000, including principal, interest, and escrow. However, beginning in August of 2009, the Debtor began receiving unusually high water bills from the City of New York, which prompted the Debtor's principal, Mr. Paul Sohayegh, to reach out to Astoria and request a temporary reduction in the required monthly payments, in order to assist the Debtor in dealing with the issues surrounding the water bills. Astoria granted Mr. Sohayegh's request, and soon after sent the Debtor a new payment coupon book reflecting a reduced monthly payment of $17,623.77.

---

[1] There is some inconsistency in the record concerning the value of the Properties. Debtor's schedule A indicates that the combined value of the Properties is $3.5 million, while Claim #3 asserts that their value is $30 million—a wide disparity. No actual appraisal of the Properties seems to appear in the record. In any event, ADHY is over-secured under either valuation even if Claim #3 is taken at face value.

There is considerable disagreement amongst the parties over whether and to what extent the Debtor kept current on its monthly payments to Astoria during the time period between September of 2009 and June of 2010. Mr. Sohayegh testified that he duly tendered every payment due from September, 2009 through April 2010 on or before the 15th of each month, by physically handing them to a teller at ADHY's local office. However, Mr. Sohayegh admitted in testimony that the Debtor did not timely make the payments for May and June of 2010. Accordingly, the Court finds that, notwithstanding the controversy and ambiguity in the record on this matter, the Debtor committed a monetary default of its loan obligations to ADHY for at least the months of May and June of 2010.[2]

On April 1, 2010, Astoria sent the Debtor a letter, purporting to outline certain monetary and non-monetary defaults under the note and mortgage (the "April Default Letter"). Strangely, the April Default Letter was not sent to the Debtor's current address at 20 W. 38th St., New York, NY. Rather, it was sent to the Debtor's former address, at 507 West 186th Street, New York, NY, even though Astoria had notice of the new address.

The April Default Letter informs the Debtor that its loan "is currently past due in the amount of $16,686.72, which is an event of default under" the relevant loan documents. The bulk of the deficiency is attributed to the fact that Astoria had applied the majority of the Debtor's March, 2010 payment of $17,623.77 to a purported escrow deficiency, rather than to payment of principal and interest. The April Default Letter also makes note of various non-monetary defaults implicating certain New York City governmental agencies. The April Default Letter further indicates that Astoria had not previously declared a default, but rather had been accepting late and/or partial payments in the past as a courtesy, in an effort to assist the Debtor. However,

---

[2] In light of this finding, for reasons that will become clearer in the Discussion section *infra*, the Court need not resolve the conflicting testimony between Mr. Sohayegh on the one hand, and Mr. Avi Dishi (principal of ADHY) on the other, concerning the extent of the Debtor's default.

going forward, payments would only be accepted if made in strict compliance with the note and mortgage. The April Default Letter is not a formal declaration of default; rather, it is merely a warning that, if the Debtor fails to cure the purported defaults by May 1, 2010, then Astoria will declare a default and exercise its rights.

On May 11, 2010, Astoria sent the Debtor another letter, this one purporting to declare the entire balance of the note and mortgage immediately due and payable,[3] based on the Debtor's alleged failure (1) to cure the defaults mentioned in the April Default Letter, and (2) to tender the monthly loan payments for April and May of 2010 in full (the "Acceleration Letter"). The Acceleration Letter does not provide for 10 days' notice and opportunity to cure. Like the April Default Letter, the Acceleration Letter was sent to the Debtor's former address, at 507 West 186th Street, New York, NY, rather than the correct address of 20 W. 38th St., New York, NY.[4]

The parties stipulate that Astoria sold the note and mortgage to ADHY on June 23, 2010. ADHY now stands in the shoes of Astoria, holding the same rights and the same deficiencies (if any) as of this date.

Mr. Sohayegh testified that the Debtor never received notice of the contents of either the April Default Letter or the Acceleration Letter until June 29, 2010. The Court accepts this testimony as truthful. It is true that a letter from the Debtor's former attorney, Mr. Stephen Siminou, to a representative of Astoria makes reference to the matters discussed in the April

---

[3] The Acceleration Letter refers to a payoff statement, annexed as "Exhibit A," which supposedly sets forth the precise amount demanded. However, Exhibit A was not supplied into evidence.

[4] The Acceleration Letter states that the Debtor's monthly payments for April and May were not received, and that the minimum amount of these payments was $21,470.34 per month. However, to this extent, the information in the Acceleration Letter seems to be incorrect. On May 28, 2010, Astoria sent the Debtor a letter indicating that its minimum monthly payments would remain at $17,623.77 per month until August of 2010, whereupon they would increase to $21,470.34 (the "Payment Change Letter"). In light of the documentary evidence in the record, and the credible testimony of Mr. Sohayegh, the Court concludes that the Payment Change Letter better reflects the mutual understanding of the parties than does the Acceleration Letter, with respect to the amount of the monthly payments, and particularly with regard to the time at which they would increase from $17,623.77 to $21,470.34.

Default Letter and/or the Acceleration Letter, but that letter is dated July 8, 2010, making the timing of the letter consistent (or at least not inconsistent) with Mr. Sohayegh's testimony.

ADHY refers to certain papers that the Debtor filed in connection with state-court litigation between the parties. In those papers, the Debtor stated that it "was notified" of the default of the payments for April and May of 2010 "on or about May 11, 2010." ADHY contends that this gives rise to the inference that the Debtor received the Acceleration Letter at that time, even though that letter was sent to the wrong address. However, Mr. Sohayegh testified that this reference was simply to the date indicated in the header of the Acceleration Letter itself, and not the date on which the Debtor actually had notice of the contents of the Acceleration Letter or the April Default Letter. There is no supporting evidence to indicate that Mr. Sohayegh's clarifying testimony in this regard is incorrect, and therefore it seems that the Debtor had no notice of the contents of either letter until approximately June 2010.

The Debtor tendered three separate payments to Astoria which totaled $65,386.35, representing 3 months' worth of installment payments, the purpose of which was to cure the abovementioned payment defaults for May and June, as well as any deficiency in the escrow account for the loan (the "2010 Cure Payments"). The 2010 Cure Payments were tendered to and cashed by Astoria on or around June 29, 2010.

Mr. Siminou reached out to Astoria by letter dated July 8, 2010 (the "July 8 Letter"). The July 8 Letter, among other things, advised Mr. Christopher Pennino of Astoria that the Debtor had not yet received any written notice of any sale of the note and mortgage to ADHY. The July 8 Letter further indicated that the Debtor would continue to remit payments and correspondence to Astoria until such time as Astoria supplied proper, written notice of where the payments should be sent as of the date of the sale.

5

In response, on July 23, 2010, Mr. Pennino sent the Debtor a letter (to the correct address), stating that Astoria sold the note and mortgage to ADHY as of June 25, 2010—before it cashed the 2010 Cure Payments (the "ADHY Sale Notification Letter"). Thus, Astoria could no longer accept payments on the note and mortgage, and it had to return the 2010 Cure Payments. All future payments had to be made to ADHY. Enclosed with the ADHY Sale Notification Letter was a check from Astoria in the amount of $65,386.35, representing the amount of the 2010 Cure Payments. Debtor has since attempted to tender the 2010 Cure Payments, plus all subsequent monthly payments, to ADHY, but ADHY has rejected them.

At some point during this time, a meeting took place between Mr. Sohayegh and Mr. Avi Dishi, who is the principal of ADHY.[5] The respective testimonies of Messrs. Sohayegh and Dishi contradict one another greatly, with respect to what took place at the meeting. In light of the Court's finding that the Debtor was in default for at least the payments corresponding to May and June of 2010, the Court need not resolve the conflicting testimony here, except insofar as to note that it credits Mr. Sohayegh's testimony on the matter, as Mr. Dishi's testimony at trial seemed more combative and self-serving than earnest and truthful.[6]

After the meeting, Mr. Sohayegh became concerned that ADHY would soon seek to have a receiver appointed in order to take possession of the Properties. In order to avoid this outcome,

---

[5] Mr. Sohayegh testified that he was unsure of precisely when the meeting took place, but he thought it transpired near the end of summer, perhaps in August of 2010. Mr. Dishi seemed to indicate that the meeting took place closer to the end of June, 2010. The difference is immaterial to the matters addressed in this Memorandum.

[6] Mr. Sohayegh testified that Mr. Dishi indicate that he did not want to accept any further payments from the Debtor (unless, perhaps, they incorporated the default interest rate for the entire period of the Debtor's alleged default). Rather, Mr. Dishi wanted to foreclose and obtain ownership of the Properties on behalf of ADHY, for the benefit of Mr. Dishi's son.

Mr. Dishi, on the other hand, testified that Mr. Sohayegh offered to pay ADHY $100,000 (later $200,000) in excess of what ADHY had paid for the note and mortgage, if ADHY would sell the note and mortgage back to the Debtor. Mr. Dishi testified that Mr. Sohayegh told him that the Debtor had persistently and systematically defaulted under the note and mortgage, in order to drive Astoria to a point of exasperation, where it would be willing to sell the loan to the highest bidder at a price well below face value. According to Mr. Dishi, Mr. Sohayegh hoped thereby to reacquire the note and mortgage at a reduced price, but ADHY outbid the Debtor.

the Debtor filed a complaint in state court against ADHY dated September 15, 2010 (the "Debtor's State Court Complaint"). The Debtor's State Court Complaint sought several items of relief, including:

(1) declaratory judgments that (A) the 2010 Cure Payments were legally effective to cure any prior default, (B) that Astoria's acceptance of the 2010 Cure Payments amounted to a waiver of the right to accelerate the loan (binding on ADHY as Astoria's successor in interest), and that (C) ADHY is thus not entitled to declare a default;

(2) a temporary and permanent injunction barring ADHY from enforcing the note and mortgage;

(3) Damages of $250,000;

(4) Certain other relief.

On September 28, 2010, as part of the Debtor's State Court Action, the Debtor filed an emergency request for a TRO and preliminary injunction, forbidding ADHY from accelerating the note and mortgage, or seeking the appointment of a receiver to enforce collection of the note and mortgage (presumably by way of foreclosure). The Debtor's State Court Action is apparently being stayed during the pendency of this bankruptcy.

On February 11, 2011, ADHY filed a foreclosure complaint against the Debtor in state court (the "Foreclosure Action"). The Debtor answered and counterclaimed, restating much of the matter in the Debtor's State Court Complaint. The Foreclosure Action is currently stayed by this bankruptcy.

On September 7, 2012, the Debtor filed its bankruptcy petition. Its stated reasons for doing so were: (1) to "obtain resolution of an ongoing dispute with its current mortgage lender, [ADHY]… over the Debtor's prior cure of certain mortgage arrears"; (2) "to obtain a final cure

and reinstatement of the [mortgage] at fair and proper levels." The affidavit submitted with the Debtor's petition indicates, basically, that the Debtor grew frustrated with ADHY's non-responsiveness in the Foreclosure Action, and so it filed this bankruptcy in order to obtain final resolution of the issues with ADHY.

The Debtor filed its plan and disclosure statement on March 11, 2013. The plan proposes to pay all creditors in full. Particularly, the plan aims to leave ADHY unimpaired (and thus ineligible to vote against the plan) by paying ADHY in full, on the effective date of the plan, the total sum of $2.39 million, consisting of: (1) $2,045,039.15 in principal and (2) $344,960.85 in interest at the non-default contract rate of 5.625%.

On April 2, 2013, this Court entered an order conditionally approving the Debtor's disclosure statement, and setting a consolidated hearing on final approval of the disclosure statement and confirmation of the plan. On April 15, 2013, ADHY filed an objection to the Debtor's plan and disclosure statement, stating that the Debtor cannot confirm a plan that pays ADHY anything less than the default rate of 20%. The Debtor states that it has accumulated sufficient funds to pay ADHY, and the Debtor's sole shareholder, Ladan Sohayegh, is contributing $2.4 million in exit financing, which she borrowed against other properties she owns. The money will be held in escrow pending the confirmation hearing. The plan proposes that the confirmation order will direct dismissal of the Foreclosure Action and satisfaction of ADHY's mortgage.

The Debtor promptly filed a partial objection to Claim #3, which objects to the claim only to the extent that it seeks interest at 20%, rather than the regular rate of 5.625%. The Debtor also objects to certain late fees and related charges.

The parties have submitted various briefs, affirmations, exhibits, and memoranda of law in support of their respective contentions, all of which have been read and considered. The Court has held various hearings in this matter, the most important of which was an evidentiary hearing on January 9, 2014. At that hearing, the Court received documentary evidence and heard testimony from Mr. Sohayegh, Mr. Siminou, and Mr. Dishi. The matter was marked submitted, and the Court indicated that matters concerning approval of the Debtor's disclosure statement and confirmation of its plan would be adjourned to a date following this Court's disposition of the issues surrounding ADHY's claim.

For the reasons that follow, the Debtor's objection to ADHY's claim for default interest is sustained.

## Discussion

11 U.S.C. § 502(a) provides that a "claim… proof of which is [properly filed]… is deemed allowed, unless a party in interest… objects." Here, the Debtor—obviously a party in interest—has objected to ADHY's filed proof of claim. Accordingly, the Court must now determine whether and to what extent ADHY's claim may be allowed. *See* 11 U.S.C. § 502(b).

Further, "[a] proof of claim executed and filed in accordance with [the Federal Rules of Bankruptcy Procedure] shall constitute prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. Pro. 3001(f). This puts the burden on the objecting party to come forward with sufficient evidence to refute the claim. Once the objector does so, it is the creditor who bears the "ultimate burden of persuasion as to the validity and amount of the claim." *Wilson v. Broadband Wireless Int'l Corp. (In re Broadband Wireless Int'l Corp.)*, 295 B.R. 140, 145 (10th Cir. B.A.P. 2003).

The Court must disallow a claim if it "is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured…." 11 U.S.C. § 502(b)(1). The Debtor essentially argues that ADHY's claim for default interest is unenforceable against it, because (among other things) Astoria and ADHY never had the right to impose default interest under the terms of the note and mortgage.

Accordingly, the issues disposed of herein are: (1) Whether the note and mortgage required notice and opportunity to cure before imposition of default interest; (2) If so, whether and when Astoria and/or ADHY gave the Debtor proper notice before seeking to impose default interest; (3) Whether the Debtor timely cured any monetary defaults, so as to deprive Astoria/ADHY of any right to demand default interest.

**(1). Whether the note and mortgage required notice and opportunity to cure.**

Paragraph 25(a) of the mortgage, standing alone, deals only with the circumstances under which Astoria may accelerate the loan. Astoria may do so in the event of, among other things,

> (a) The default in the payment of any installment of principal and interest within fifteen (15) days of the date that the same comes due, **following any grace period and applicable written notice to cure such default. Mortgagee shall give a ten (10) day written notice to cure any monetary default.** However, Mortgagee is not obligated to give notice to cure a monetary default more than once in any calendar year[…].

(Emphasis added). Paragraph 26 deals with when and under what circumstances the loan holder may impose the default rate of interest. It provides, in pertinent part:

> If any monthly payment hereunder or under the terms of the [note or mortgage] is not made within fifteen (15) days after the same first becomes due, **or** if there is a default in any of the other [non-monetary] terms and conditions of this Consolidated Mortgage and the Note executed simultaneously herewith, **which default continues after any required notice to cure and such default has not been cured after any applicable grace period**

10

>>then and after the date of such default the Borrower shall pay interest at the default rate….

(Emphasis added).

ADHY contends that the mortgage does not require the note holder to provide the Debtor with any notice or opportunity to cure before default interest may be imposed. The Debtor argues the opposite. For the reasons that follow, the Court finds that the note and mortgage require at least 10 days' written notice and opportunity to cure before the imposition of default interest.

A mortgage document should be interpreted as any contract. *See* 1-4 Bergman on New York Mortgage Foreclosures § 4.05[1][a]. Since the above-quoted language of the mortgage seems capable of reasonable alternative constructions, it is ambiguous, so the Court may resort to principles of contractual interpretation. *See* 22 N.Y. Jur. 2d Contracts § 209. To that end, "[t]he objective of interpretation in the general law of contracts is to carry out the understanding of the parties…." Restatement (Second) of Contracts § 201, *comment c*. Furthermore, where an agreement is set forth in a writing, select excerpts from the contractual language must not be interpreted in isolation; rather, the language of the entire agreement must be "interpreted as a whole, and all writings that are part of the same transaction are interpreted together." *Id.* at § 202(2). *Accord* 22 N.Y. Jur. 2d Contracts § 248 (noting that "[b]ecause the intention of parties to a contract is ascertained, not from one provision or particular words or phrases, but from the entire instrument, in the construction of contracts, the entire contract must be considered.").

Again, paragraph 25(a) provides for acceleration of the loan balance if any monetary default is not cured within 15 days of the due date, plus any applicable grace period and notice to cure. That paragraph further provides that 10 days' written notice and opportunity to cure shall be given with respect to any monetary default.

The above-quoted language from paragraph 26 provides that default interest may not be imposed unless a default persists after any required written notice and opportunity to cure. This, in turn, brings us back to paragraph 25(a), which clearly requires 10 days' written notice and opportunity to cure with respect to monetary defaults.

Nevertheless, ADHY claims that the "notice and opportunity to cure" requirement of paragraph 26 only refers to <u>non-monetary</u> defaults. ADHY appears to rely on something akin to the "doctrine of the last antecedent" in arguing that the modifier pertaining to notice and opportunity to cure in paragraph 26 only applies to the language immediately preceding it, which refers only to non-monetary defaults.

Terri LeClercq describes the doctrine of the last antecedent as follows:

> Referential and qualifying phrases, where no contrary intention appears, refer solely to the last antecedent. The last antecedent is the last word, phrase, or clause that can be made an antecedent without impairing the meaning of the sentence. This proviso usually is construed to apply to the provision or clause immediately preceding it.

Terri LeClercq, *Doctrine of the Last Antecedent: The Mystifying Morass of Ambiguous Modifiers*, 2 Legal Writing: J. Legal Writing Inst. 81 (1996)(*hereinafter LeClercq*). In other words, if "no contrary intention appears, the 'rule of the last antecedent' provides that a limiting clause or phrase should ordinarily be read as modifying only the noun or phrase that it immediately follows." *In re Enron Creditors' Recovery Corp.*, 422 B.R. 423 (S.D.N.Y. 2009)(interpreting statute). Here, the notice and cure language in paragraph 26 immediately follows a reference to non-monetary defaults, which is separated by a comma and a coordinating conjunction from the prior reference to monetary defaults. Hence, ADHY contends that the "notice and opportunity to cure" modifier ought to be construed to refer only to non-monetary defaults under the note and mortgage.

12

Nevertheless, the doctrine of the last antecedent is merely an

> aid to discovery of intent or meaning and is not inflexible and uniformly binding. Where the sense of the entire [document] requires that a qualifying word or phrase apply to several preceding or even succeeding sections, the word or phrase will not be restricted to its immediate antecedent.

*LeClercq, supra* at 87. Indeed, the Court may properly look to the punctuation and grammatical arrangement of contractual language for guidance as to its meaning. 22 N.Y. Jur. 2d Contracts § 241. To that end,

> [e]vidence that a qualifying phrase is supposed to apply to all antecedents instead of only to the immediately preceding one may be found in the fact that it is separated from the antecedents by a comma.… [I]f a string of antecedents is followed by a comma, that comma separates the modifier from the last antecedent and thus allows it to modify each of the antecedents.

*Id.*[7]

Here, the modifier in paragraph 26, referring to notice and opportunity to cure, is separated from the immediately preceding antecedent—the mention of non-monetary defaults—by a comma. Accordingly, it seems more natural to read the "any applicable notice" requirement of paragraph 26 to apply to both kinds of default discussed in that paragraph.[8]

This reading makes all the more sense when one considers paragraph 46, which clearly imposes a late fee if a payment is made later than 15 days after the due date. Paragraph 46 contains no reference to any notice or opportunity to cure, while paragraph 26 clearly does contain such a reference. The imposition of a sky-high 20% default rate of interest, instead of a much-lower rate of 5.625%, is such a severe change that it seems vastly more reasonable to

---

[7] *But see In re Enron Creditors' Recovery Corp.*, 422 B.R. at 433-434 (interpreting statute; applying rule even though modifier was set off from the last antecedent by a comma).

[8] This would not be the first court decision to turn on the placement of commas. *See, e.g. U.S. v. Ron Pair Enterprises*, 489 U.S. 235, 249 (O'Connor, J., dissenting)(complaining that the majority could decide the case as it did "only because of the comma following" certain key statutory language).

interpret the loan documents as requiring written notice before the default rate may be imposed, at least where the language permits such a construction, as it clearly does here. Therefore, the Court finds that at least 10 days' written notice and opportunity to cure is required under the note and/or mortgage before the default rate of interest may be imposed.

### (2) Whether and when Astoria/ADHY gave the Debtor proper, written notice.

Now, the Court must determine whether and when the Debtor received proper notice of any default. The Court notes Mr. Sohayegh's testimony indicating that the Debtor never got notice of either the April Default Letter or the Acceleration Letter until around June 29, 2010. It is true that the mortgage provides that the Debtor is only entitled to notice of monetary default once in any given calendar year. There is no indication in the record that the Debtor actually received such written notice at any point in 2010 before June 29. Indeed, the April Default Letter states that Astoria had "not previously declared an event of default…."

Where contractual notice is sent by first-class mail to the correct address, the common law presumes that it was received by the other party, absent sufficient proof to the contrary. However, where notice is sent to the wrong address after the sender has been properly notified of the correct address, this presumption is inapplicable. *See* 1-4 Bergman on New York Mortgage Foreclosures § 4.05 *and cases cited therein*; *Cf. Greyhound Capital Corp. v. EDP Medical Computer Systems, Inc.*, 147 A.D.2d 674 (N.Y. 2d Dep't 1989); *cf. also Dougherty v. 425 Development Assoc's*, 93 A.D.2d 438 (N.Y. 1st Dep't 1983).

At the trial in this matter, Mr. Sohayegh indicated that he sent the 2008 notice of the Debtor's change of address to the loan servicing address, rather than the address of Astoria's principal place of business. However, regardless of this, the parties have stipulated that "[a]fter May 6, 2008, Astoria issued loan statements and coupon books to the Debtor at [the new address

14

of] 20 West 38th Street, New York, New York…." Accordingly, at the time Astoria sent the April Default Letter and the Acceleration Letter, it had notice of the Debtor's new address, but sent the letters to the wrong address. Furthermore, the Acceleration Letter itself does not mention default interest, nor does it give 10 days' notice and opportunity to cure. Therefore, the Court finds that the Debtor did not receive adequate notice of monetary default under the terms of the mortgage until at least on or around June 29, 2010, consistent with Mr. Sohayegh's testimony.

### (3) Whether the Debtor timely cured any monetary defaults.

This issue brings up three related questions: (A) Were the 2010 Cure Payments sufficient, in amount, to cure any outstanding defaults as of June 29, 2010? (B) Was Astoria and/or ADHY entitled to reject the 2010 Cure Payments? (C) Were the 2010 Cure Payments legally effective to bring the Debtor's account "current," even though tendered to the wrong entity?

*(A) Amount.*

The Court concludes that the 2010 Cure Payments were sufficient in amount to cure any outstanding defaults, based on the record of evidence in this case. First, the April Default Letter seems to indicate that the sum total of the Debtor's monetary default, as of April 1, 2010, was $16,686.72—presumably including arrearages, escrow deficiencies, late charges, and so on.

Second, the Debtor's required monthly payment as of April 1, 2010 was $17,623.77, and the record indicates that this payment was made timely, so no late fee accrued on that payment.[9] Moreover, $17,623.77 remained the required monthly payment ($18,504.96 if late) until August of 2010, when the payment increased to $21,470.34 per month, as indicated in the coupon book supplied into evidence, considered together with the Payment Change Letter mentioned above (*see* fn. 4, *supra*). Further, Mr. Sohayegh admitted that the payments for May and June were not

---

[9] The Debtor supplies into evidence a check made out to Astoria, in the amount of $17,623.77, dated April 15, 2010. The Court credits Mr. Sohayegh's testimony that he hand-delivered the check to Astoria on April 15, which means that the April payment was made within the grace period, so that no late fee could be imposed.

15

made on time. With the late fee, the minimum payment for each of these two months was $18,504.96, according to the coupon book supplied into evidence. Therefore, the 2010 Cure Payments, made on June 29, 2010, would have to total $53,696.64 in order to cure the arrearages of $16,686.72, plus the late payments for May and June of $18,504.96 respectively. The 2010 Cure Payments totaled more than $65,000. Accordingly, the 2010 Cure Payments, as tendered, were sufficient to cure any outstanding arrearages existing as of June 29, 2010.

*(B). Rejection of payments.*

The Court concludes that Astoria and/or ADHY were not entitled to reject the 2010 Cure Payments. In New York, where a mortgagee has validly elected to accelerate a mortgage, it is not obliged to accept anything less than full repayment of the loan. *Centerbank v. D'Assaro*, 600 N.Y.S.2d 1015, 1017 (N.Y. Sup. Ct. 1993). However, if the mortgagor duly tenders all amounts necessary to cure a monetary default <u>before</u> the mortgagee validly exercises its right to accelerate, then the mortgagee must accept that tender. Further, in order for the mortgagee validly to exercise its right to accelerate, it must provide any notice to the mortgagor that is required by the agreement between the parties. *See Albertina Realty Co. v. Rosbro Realty Corporation*, 258 N.Y. 472, 475 (N.Y. 1932); *446 w. 44th St. v. Riverland Holding Corp.*, 44 N.Y.S.2d 766 (1st Dep't 1943); 78 N.Y. Jur. 2d Mortgages §§ 504, 622.

Accordingly, while ADHY is correct that the right to accelerate the loan is not directly germane to the right to impose default interest, the question here is whether Astoria had the right to reject the 2010 Cure Payments—which bears on whether any prior defaults were timely cured. If Astoria was entitled to reject those payments, then only full repayment could have cured any default; if not, then the 2010 Cure Payments were sufficient. Astoria's right to reject the 2010 Cure Payments hinged on whether or not it had legitimately accelerated the loan, which in turn

hinged on whether it provided 10 days' written notice and opportunity to cure, as required in paragraph 25(a) of the mortgage. Thus, for the same reasons that Astoria did not provide sufficient written notice and opportunity to cure before imposing default interest, it did not provide sufficient notice in order to justify accelerating the loan. Therefore, Astoria/ADHY could not rightly reject the 2010 Cure Payments.

      *(C). Payments to the wrong entity.*

The parties have stipulated that Astoria sold the note and mortgage to ADHY on June 23, 2010. The 2010 Cure Payments were not tendered to Astoria until June 29, 2010, meaning that the Debtor in fact tendered the 2010 Cure Payments to the wrong entity. (The Debtor also tendered the July, 2010 payment to Astoria.)

Notwithstanding, the Court finds that the Debtor tendered the 2010 Cure Payments, as well as the payment for July of 2010, properly and in accordance with the note and mortgage. The first three paragraphs of the note provide that the Debtor promises to pay Astoria at its principal place of business, "or at such other places as may be designated **in writing** by the holder of [the] Note." (Emphasis added). Accordingly, if the note holder wants the Debtor to send payments to an address other than that specified in the note, it must give the Debtor <u>written</u> notice of the change in address.

While the Debtor's counsel acknowledged having been advised of the sale of the loan to ADHY as of the date of the July 8 Letter, that same letter indicates that the Debtor had no <u>written</u> notification of where to send future payments. Nothing appears in the record to contradict that statement. Indeed, the record does not indicate that Astoria provided the Debtor with any written notification of the sale to ADHY (and hence the need to send the payments to ADHY's address) until at least July 23, 2010, the date of the ADHY Sale Notification Letter. Therefore, since

Astoria did not provide the Debtor with <u>written</u> notification of ADHY's address until July 23, 2010, the Court finds that both the 2010 Cure Payments and the July 15 payment were tendered properly, in accordance with the terms of the note and mortgage.

In summary, the Court finds that the Debtor did not have the required notice of monetary default until on or around June 29, 2010. The 2010 Cure Payments were more than sufficient to cover any arrearages existing at that point, and they were validly, duly, and properly tendered to Astoria within 10 days of the Debtor's receipt of proper notice. Therefore, Astoria never had, and ADHY does not now have, the right to compel the Debtor to pay default interest under the terms of the note and mortgage. Thus, ADHY's claim for default interest is disallowed entirely.

**Other issues**

In light of the Court's disposition of this matter, the Court need not address the other issues that the parties have raised in this case, namely: (A) whether the default rate of interest here was waived when Astoria accepted and cashed the 2010 Cure Payments; (B) whether the 20% default rate here constitutes an unenforceable penalty; (C) whether the "cure and reinstatement" provisions of 11 U.S.C. § 1124 require payment of default interest in this case.

As mentioned above, the Debtor has contested certain late fees and other charges that ADHY has sought to impose. In light of the Court's finding that all prior arrearages were cured on the date of the 2010 Cure Payments, and because no one has seriously contended that the Debtor was late with any attempted payments after that time, the late charges will be disallowed as unenforceable against the Debtor under the note and mortgage. *See* 11 U.S.C. § 502(b)(1). The pre-payment penalty and any legal fees due and owing to ADHY will be calculated at a later time, in accordance with the note and mortgage, as the parties have provided scant evidence and

argument directly pertaining to these matters, but instead have primarily focused their attention on the default rate of interest.

In accordance with this Court's directive at the prior hearing on January 9, 2014, the final hearing on approval of the Debtor's disclosure statement and confirmation of its plan will be adjourned to a later date.

The mere fact that there are parallel state court proceedings involving many of the same issues raised here does not *ipso facto* require this Court to deny the claims objection or to abstain from hearing it. *See* 28 U.S.C. § 1334(c)(2); *compare Buffets, Inc. v. Leischow,* 732 F.3d 889 (8th Cir. 2013). As the hearing on approval of the Debtor's disclosure statement and confirmation of its plan are being adjourned to a later date, the Court will not deal with these issues now.

## Conclusion and Summary

For the reasons stated herein, the Court sustains the Debtor's objection to ADHY's claim for default interest. The final hearing on confirmation of the Debtor's plan and approval of the disclosure statement will be adjourned, to a date to be determined. A separate order will issue, in conformity with this Memorandum.

**Dated: Central Islip, New York**
**March 27, 2014**

**Dorothy Eisenberg**
**United States Bankruptcy Judge**